In re AIR CRASH DISASTER AT STAPLETON INTERNATIONAL AIRPORT, DENVER, COLORADO, ON NOVEMBER 15, 1987.

Karen Svea JOHNSON and Robert Cooke, Jr., wife and husband, Plaintiffs,

v.

CONTINENTAL AIRLINES, INC., a Delaware Corporation, Defendant.

MDL No. 751.
No. 88–F–664.

United States District Court,
D. Colorado.

March 10, 1989.

## ORDER MDL 751–33
## ORDER ON POST–TRIAL MOTION

SHERMAN G. FINESILVER, Chief Judge.

This multidistrict action involves claims for personal injury and wrongful death arising out of the crash of a commercial airliner. Plaintiffs in the instant matter are Karen Svea Johnson, a passenger injured in the crash, and Robert Cooke, Jr., her husband. Defendants in this litigation are Continental Airlines, Inc., ("Continental") and Texas Air Corporation.[1] Other

interested parties include several passengers whose claims were joined with Ms. Johnson's for certain purposes. The Johnson case was selected and tried as an exemplar case by her counsel and the Plaintiffs Steering Committee.[2] Consolidated liability claims of all plaintiffs, as well as the Johnson and Cooke claims for compensatory damages, were tried to a jury during a three week period in January of 1989. Specifically, plaintiffs' common claims alleged liability for negligence, punitive damages, and false advertising under the Texas Deceptive Trade Practices Act. The jury returned its verdicts on January 31, 1989, finding, in summary, (1) plaintiffs Karen Johnson and Robert Cooke, Jr. suffered damages in certain amounts, (2) defendant's conduct was either willful or reckless, under Idaho law, (3) defendants were not grossly negligent and should not be held liable for punitive damages under Texas law, and (4) defendants trade practices were deceptive, as defined by Texas law, but these practices did not cause injury to plaintiff Karen Johnson. The jury initially reviewed defendant's conduct under the law of Idaho in regard to that state's limitation on the size of a non-economic damage award. The jury reviewed defendant's conduct again under Texas law to determine if punitive damages should be assessed.

The matter comes before the court on post-trial motions of the Plaintiffs Steering Committee and of certain plaintiffs, filing separately, for amended judgment or new trial, filed February 15, 1989.[3] Individually

---

1. The court dismissed claims against Texas Air during trial.

2. The Plaintiffs Steering Committee is a group of attorneys appointed by the court for the purpose of conducting consolidated discovery and litigating issues common to all claimants. Collectively, the attorneys serving on the Steering Committee represent a majority of the plaintiffs in this multidistrict litigation. Individual plaintiffs and counsel reside in Colorado, Idaho, New Jersey and Arizona.

By "exemplar" case, we mean the claims of particular plaintiffs selected for full trial of all issues, including compensatory damages, to serve as a back-drop for resolution of common claims including punitive damages, consolidated for trial before one jury to serve goals of fairness, consistency and efficiency. *See In re Air*

*Crash Disaster at Stapleton Int'l Airport,* Order MDL 751–17, 720 F.Supp. 1455, 1458–59 (D.Colo. Nov. 29, 1988).

3. Ms. Johnson and Mr. Cooke are represented by David Comstock, Esq., William Dreyden, Esq. and Marc Moller, Esq. Mssrs. Comstock and Moller are also members of the Steering Committee. The post-trial motions currently at issue were filed by the Steering Committee through Mssrs. Comstock and Moller, Richard Schaden, Esq., John Breit, Esq., William Batt, Esq. and Frank Coppola, Esq. Additional motions were filed by Robert Koontz, Esq. and David Gratton, Esq. for plaintiffs Smith (Case No. 88–F–990), Stewart (Case No. 88–F–898), and Spicer (Case No. 88–F–991). Ms. Johnson's attorneys have filed no motions beyond those filed on her behalf by the Steering Committee.

and collectively, plaintiffs' various objections to judgment in regard to liability and punitive damages are unpersuasive. Plaintiffs were afforded a fair and complete trial on all issues. The jury verdicts clearly establish that punitive damages were not warranted in this multidistrict litigation. Compensatory damage awards to plaintiffs Johnson and Cooke are supported by an extensive trial record. The court's instructions clearly set forth the applicable rules of law. Plaintiffs were afforded wide latitude to present relevant evidence in support of their complaint. The several issues addressed in this opinion are organized as follows:

I. Post–Trial Motions.

II. Background.

    A. Factual Background.

    B. Procedural Background.

    C. Jury Verdicts and Current Disposition of Claims.

III. Inconsistent Verdicts.

    A. Assignment of Error.

    B. Standards of Inconsistency.

    C. Internal Consistency—Different Standards.

    D. Internal Consistency—Different Claims.

IV. Presentation of Punitive Damage Claims.

    A. Punitive Damages and Mass Tort Litigation.

        1. Instructing the Jury on the Multi–District Verdict.

        2. Evidence of Other Crash Victims.

    B. Division of Proof and the Stipulated Trial Plan.

    C. Dismissal of Claims Against Texas Air Corporation.

    D. Conclusion—Punitive Damage Issues.

V. Verdicts Contrary to Evidence or Law.

    A. Compensatory Damages.

        1. Economic Damages.

        2. Non–Economic Damages.

        3. Conclusion—Compensatory Damage Issues.

    B. Causation Under the Texas Deceptive Trade Practices Act.

VI. Amended Judgment.

## I. POST–TRIAL MOTIONS

In two sets of motions currently before the court, plaintiffs raise objections to the form of judgment, consistency of the verdicts, and conduct of trial.

In regard to the individual claims of Karen Johnson and Robert Cooke, Jr., the Steering Committee contends (1) the compensatory damage award is wholly inadequate in light of evidence presented at trial, (2) the deceptive trade practices verdict is contrary to the weight of the evidence, and (3) the form of judgment does not reflect the language of the verdicts, improperly deducts certain amounts as a set-off, and does not reflect the appropriate rate of pre-judgment interest. The Steering Committee seeks modified judgement or new trial on the Johnson claims.

In regard to consolidated claims, the crux of the post-trial motions is that entry of judgment on punitive damage claims is error. The Steering Committee contends that the conduct of trial and the entry of judgment on inconsistent verdicts prejudiced the punitive damage claims of Ms. Johnson and Mr. Cooke as well as the consolidated punitive damage claims of all plaintiffs. The Steering Committee contends (1) the verdict finding defendant Continental not liable for punitive damages is inconsistent with special interrogatories returned by the jury on claims for non-economic damages, (2) errors in the application of the stipulated trial plan prejudiced presentation of claims for punitive damages, (3) confusion in regard to bifurcation of punitive damage issues under the stipulated trial plan also prejudiced these claims, and (4) dismissal of claims against defendant Texas Air Corporation was in error and prejudiced plaintiffs' recovery of a punitive damage award. Certain other plaintiffs, filing separate motions, reiterate these objections and contend further that the court's instructions on punitive damage issues misstated the applicable law. Both groups seek modification of judgment to reflect that defendant's conduct was grossly negligent, leaving a determination of

liability for punitive damages for resolution by reconvening the jury, or, in the alternative, new trial in the exemplar case.

Certain recitals in the motions are directed to the applicability of the exemplar trial verdict to other plaintiffs. Those issues will be addressed in the Final Pretrial Order which will be entered at a later date. *See* Order MDL 751–32, slip op. (Feb. 10, 1989).

Plaintiffs' motions for new trial are DENIED. With the exception of the language of judgment, the amount of set-off, and pre-judgment interest, we find that the objections raised require no action by the court. Plaintiffs' motions to modify judgment are DENIED as to all issues except those regarding form of judgment. Recalculation of the appropriate set-off against Ms. Johnson's damages and correction of the wording of the verdicts will be resolved by subsequent order, following briefing of the conflicts of law principles effecting an award of pre-judgment interest.[4]

## II.  BACKGROUND

The court has jurisdiction over these actions based on diversity of citizenship and a conditional transfer order entered by the Judicial Panel on Multidistrict Litigation. *See* 28 U.S.C. §§ 1332 & 1407; *In re Air Crash Disaster at Stapleton Int'l Airport,* 683 F.Supp. 266 (J.P.M.L.1988).

A.  *Factual Background.*

These cases arise out of the crash of Continental Airlines Flight 1713 on November 15, 1987. Flight 1713 crashed as it attempted take-off from Stapleton International Airport in Denver, Colorado during a heavy snow storm. Flight 1713 was scheduled for flight to Boise, Idaho.

At trial, the physical causes of the crash were shown to be ice on the fuselage and pilot error. Ice on an aircraft can alter or defeat the aerodynamic shape of the wings and thus prevent normal flight. The danger can be prevented by "deicing," a procedure by which chemicals are sprayed on the wings and fuselage of an aircraft to remove accumulated ice and snow and to delay reaccumulation. Between passenger boarding and take-off, communications between the cockpit crew, the control tower and other Continental employees became confused. An inordinate delay between deicing and take-off may have caused ice to reaccumulate on the aircraft.

To passengers and the cabin crew, the aircraft seemed sluggish during its take-off roll. Upon lift-off the plane dipped to one side. Testimony at trial indicated that the pilot, First Officer Lee Bruecher, may have improperly compensated for the shift. The wing of the aircraft struck the ground and the aircraft flipped over, broke apart and exploded, sending a fire-ball through the cabin from front to back.

Twenty-eight (28) persons, mostly in the front section of the cabin, were killed; fifty-four (54) others were injured. The captain, first officer and a flight attendant were among the dead. A majority of the victims were residents of Idaho. Idaho plaintiffs include Ms. Johnson and members of a high school agricultural club returning to Boise from a national convention. Passengers ranged in age from an infant to senior citizens.

Plaintiff Karen Johnson suffered extensive injuries in the crash. Her injuries included several broken ribs, lung damage, torn aorta descending to her heart, nerve damage affecting the muscles which control her eye, fractured left leg, fractured left arm, bruises to her brain, and post-traumatic stress. Ms. Johnson was hospitalized in Denver and Boise and required further home care and physical therapy. Ms. Johnson underwent surgery on different occasions to attach a synthetic graft in place of her damaged aorta and to insert pins, plates and screws in her broken bones. Further procedures will be necessary to remove the orthopedic devices and perhaps to correct the double-vision which currently requires Ms. Johnson to wear an eye patch. Ms. Johnson is pursuing correc-

---

4. The issue was raised for the first time in the reply brief filed by the Steering Committee in support of its motions. Because the progress of this litigation requires immediate resolution of those matters fully briefed by the parties, we will amend judgment, if necessary, at one time, upon fuller consideration of the issue.

tive lenses as an alternative to the latter surgery, which she currently finds an unacceptable risk. Medical practitioners treating Ms. Johnson characterize her drive and rate of recovery as remarkable.

The permanency of Ms. Johnson's injuries was an issue litigated at trial. Ms. Johnson was 32–years old at the time of the crash and had recently begun a career as a technical editor in the communications department of a multi-national engineering firm. Her medical and psychological experts testified. as to limitations on her career and quality of life arising from intellectual problems attributed to brain injuries, emotional problems attributed to trauma, and physical impairment attributed to her bodily injuries. Defendants placed the matter before the jury on differing interpretations of recovery data offered by plaintiffs' experts. Defendants suggested the data indicates a trend of rapid recovery and steady improvement without supporting plaintiffs' theory that recovery is complete in regard to job performance or physical stamina.

### B. *Procedural Background.*

On April 14, 1988, the Judicial Panel on Multidistrict Litigation transferred all pending federal cases arising out of the crash to this court for consolidated pretrial proceedings. *In re Air Crash Disaster at Stapleton Int'l Airport,* 683 F.Supp. 266 (J.P.M.L.1988) (later filed cases were transferred by subsequent order). The court established procedures for consolidated discovery and resolution of pretrial issues common to all cases. The court appointed a Plaintiffs Steering Committee, whose membership represented the vast majority of cases pending, to litigate pre-trial and common issues on behalf of all plaintiffs. *See In re Air Crash Disaster at Stapleton Int'l Airport,* slip ops., Orders MDL 751–1 and 2 (D.Colo.1988). From time to time,

the court was called upon to address the concerns of plaintiffs who disagreed with positions taken by the Steering Committee. *See, e.g.,* Order MDL 751–16, 720 F.Supp. 1445 (D.Colo.1988) (addressing choice of law issues of dissenting plaintiffs as well as the Steering Committee).

In accordance with the charge of the Multidistrict Panel that we administer proceedings to further the just, speedy and efficient resolution of these cases, the court supervised discovery and ruled upon various issues presented and memorialized in the consolidated Pretrial Order. In addition, several rounds of settlement negotiations were held in Denver, Colorado and Boise, Idaho. A settlement master was also appointed to conduct settlement discussions between counsel and the parties. *See* Orders MDL 751–6, 10, 12 and 23 (D.Colo.1988) [MDL 751–12 published at 720 F.Supp. 1433].

Throughout the course of the pre-trial phase of these cases, the court held monthly status conferences. The comprehensive Pretrial Order entered on September 1, 1988 was a joint effort drafted pursuant to the management orders of the court. The Pretrial Order outlined a prospective trial plan whereby common claims of liability would be litigated through consolidation and trial of an exemplar case.

The court resolved inherent substantive legal issues during the Fall of 1988. An order on conflicts of law questions was entered on November 15, 1988.[5] The parties had agreed that issues of liability for negligence would be resolved under Colorado law. Also by agreement, issues of compensatory damages would be resolved under the law of a plaintiffs' domicile. As to issues of corporate liability for punitive damages, the court held the law of Texas was controlling. In a detailed order applying choice of law principles, the court reasoned that Texas had the most significant relationship to the parties and the subject matter of those claims. Order MDL 751–

---

5. Plaintiffs are residents of various states including Arizona, Colorado, New Jersey and Idaho. Defendant Continental and its parent-company, Texas Air Corporation (an original co-defendant in these cases) are Delaware corporations with corporate headquarters in Texas. Plaintiff Karen Johnson and her husband are residents of Idaho. For several plaintiffs, Flight 1713 was the continuation of travel begun in other jurisdictions which required a change of planes in Denver, Colorado. Defendants maintain a transfer "hub" at Denver's Stapleton International Airport.

16, 720 F.Supp. 1445 (D.Colo. Nov. 15, 1988). The court denied defendant's motion for certification of that order for interlocutory appeal. *See* Orders MDL 751–18 and 19 (D.Colo. Dec. 2, 1988).[6]

On November 29, 1988, the court adopted a trial variation plan proposed by the parties. All cases were transferred to the District of Colorado and all cases were consolidated for resolution of common issues of liability and punitive damages through an exemplar trial. Order MDL 751–17, 720 F.Supp. 1455 (D.Colo. Nov. 29, 1988). The court resolved a dispute between the parties as to which cases would serve as the exemplar trial. Based on the submissions of the parties, the court selected two cases for trial, namely those brought by plaintiffs Hugh and Julia Ford (Case No. 87–F–1922, filed in the District of Colorado on Dec. 17, 1987) and plaintiffs Karen Svea Johnson and Robert Cooke, Jr. (Case No. 88–F–664, filed in the District of Idaho on Feb. 24, 1988). No objection to this order was ever filed, noted or argued by any party. Prior to trial, the Ford case settled and was dismissed.

Under the stipulated trial plan, the issues of this litigation would be resolved in several phases. Common claims for liability were to be resolved at trial of liability and compensatory damages during Phase I of the litigation. Specifically, consolidated claims of liability for punitive damages were to be resolved during the exemplar trial of the claims of Ms. Johnson and Mr. Cooke. In the event the jury found punitive damages were warranted, the total amount of that award would be determined during Phase II. The plan specified that this award would be distributed among plaintiffs on a pro-rata basis. With liability issue resolved, individual cases would be transferred back to the districts in which they were filed for a Phase III determination of the amount of compensatory damages to be awarded in each case. The plan called on the court to retain jurisdiction over the punitive damage award upon transfer of the individual cases. The trial plan is well documented in the record, delineated through (a) clear and unequivocal court orders, (b) a joint motion of the parties, (c) submissions regarding selection of an exemplar case, and (d) a statement of other cases ready for trial, filed by the Steering Committee, upon settlement in the *Ford* case.[7]

The case proceeded to trial on joined claims and the complaint of Karen Johnson and her husband Robert Cooke, Jr. on January 9, 1989. The court conducted substantial voir dire of potential jurors and a panel of ten jurors was selected, four designated as alternates. The court carefully constructed an eight page juror questionnaire, incorporating modifications of its standard voir dire and proposed questions tendered by the parties. The questionnaire

---

**6.** Through motions for summary judgment, the court also resolved several constitutional issues which arose late in the litigation. We held (1) federal statutes and regulations regarding interstate air traffic and commercial air carriers did not preempt state regulation of aircraft safety through tort claims for punitive damages, (2) federal certification and regulation of Continental's practices does not preclude liability for punitive damages as a matter of law, (3) choice of law principles do not preclude plaintiffs from maintaining claims against Continental under the Texas Deceptive Trade Practices Act, and (4) defendant's constitutional challenge to Texas punitive damage law would not be ripe until after trial. Order MDL 751–24, slip op. (D.Colo. Dec. 23, 1988).

The court also denied plaintiffs' constitutional challenge to defendant's designation of an entity statutorily immune from tort liability, the City and County of Denver, as a non-party at fault pursuant to Colorado law. Under Colo.Rev.

Stat. § 13–21–111.5, non-parties designated by a defendant in a timely manner must be included in comparative fault verdict forms submitted to the jury. The statute abolishes joint and several liability to the extent that a defendant may not be compelled to bear the percentage of damages attributed to the non-party by the jury. In denying plaintiffs' motion to strike, the court found (1) plaintiffs constitutional challenge was not ripe, and (2) the Colorado comparative fault statute did not deprive plaintiffs of their right to compensation for an actionable injury without due process or equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution and Article II, Section 25 of the Colorado Constitution. Order MDL 751–28, 720 F.Supp. 1465 (D.Colo. Jan. 5, 1989). Defendants' designation of the City and County of Denver was subsequently dropped. The jury was not called upon to consider the conduct of the City.

**7.** *See infra* discussion at § IV.B, pp. 1481–82.

was specifically designed to determine (a) comprehensive background information including employment history, education, and family circumstances, (b) juror knowledge of the crash, due to extensive media coverage of the crash, (c) juror knowledge of widely publicized public hearings held by the National Transportation Safety Board in Golden, Colorado during the summer of 1988, (d) juror knowledge of the pre-trial aspects of this litigation, due to continuing media coverage of the case, and (e) the opinions of jurors on the propriety of personal injury litigation and recovery, due to advertisements directed at so-called "lawsuit abuse." During further individual voir dire in open court, the parties were provided copies of the completed questionnaires. Counsel from each side were invited to approach the bench prior to being asked to challenge potential jurors for cause. On the request of counsel, the court then asked additional questions of certain jurors, including confidential inquiry at the bench regarding exposure of one juror to materials of particular concern to plaintiffs.

### C. *Jury Verdicts and Current Disposition of Claims.*

Prior to submission of the case to the jury, the court directed a verdict in favor of defendant Texas Air Corporation and dismissed plaintiffs' claims of intercorporate liability.

The jury returned its verdicts in the exemplar trial of *Karen Svea Johnson, et al., v. Continental Airlines, Inc.,* 88–F–664, on January 31, 1989. Judgment reflecting the jury's verdicts was entered on February 7, 1989. In their unanimous verdicts, the jury found (a) plaintiff Karen Johnson had incurred damages in the total amount of $779,000, (b) plaintiff Robert Cooke, Jr. had incurred damages in the total amount of $21,700 for loss of consortium, and (c) defendant Continental Airlines had acted either willfully or recklessly under Idaho law, thereby precluding the court from applying the limitation on non-economic damages established under Idaho law. *See* Idaho Code § 6–1603. The jury found that although the Federal Aviation Administration ("FAA") had been negligent, its negli-

gence was not a cause of injury to the plaintiffs under Colorado law. Applying Texas law, the jury found that Continental was not grossly negligent and should not be assessed punitive damages and further that defendant had not acted with malice. Finally, the jury found that although Continental had engaged in deceptive trade practices, those practices were not a cause of the injuries suffered by plaintiff Karen Johnson under Texas law.

## III. INCONSISTENT VERDICTS

We have considered and reject plaintiff's contention that the jury verdict is inconsistent in respect to its finding that defendants are not liable for punitive damages. Inconsistency is asserted as grounds either to modify judgment to express only a finding characterizing defendant's conduct as gross negligence, or to order a new trial, pursuant to Rule 59 of the Federal Rules of Civil Procedure. In particular, plaintiffs contend that the jury's response to a special interrogatory finding defendant's conduct willful or reckless under Idaho law is inconsistent with its general verdict that defendant was not grossly negligent and should not be held liable for punitive damages under Texas law. *See* Appendix A, Special Verdict Forms.

Plaintiffs Johnson and Cooke and other plaintiffs, by and through the Plaintiffs Steering Committee, state that the verdicts are inconsistent because (1) standards of conduct at issue in each verdict are virtually identical, and (2) discretion exercised by the jury in not awarding punitive damages was reserved for its Phase II determination of the amount of a punitive damages, if any, to award. Plaintiffs Smith, Stewart, and Spicer incorporate these objections and contend further that the jury was improperly instructed on the punitive damages claims and thus failed to realize that the standards of conduct at issue were identical. Plaintiffs' objections ar unfounded. The jury was carefully, thoroughly and correctly instructed on the question of punitive damages. The verdicts represent thoughtful application of the law of both Texas and Idaho.

### A. Assignment of Error.

■ Plaintiffs' post-judgment objections to the verdict were not properly preserved on the record. Where the jury is not discharged and the trial court provides an opportunity to the parties to resubmit questions to the jury regarding an allegedly inconsistent verdict, a party who fails to invoke this possible course of action under Rule 49(b) of the Federal Rules of Civil Procedure has waived an objection to inconsistencies between a general verdict and special interrogatories. *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1423 (10th Cir.) (citing rules of various circuits), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

Plaintiffs contend that this alternative would have been futile considering the likelihood that post-trial publicity would have tainted the jury. Plaintiffs' contention is inconsistent with the progress of this litigation. On January 31, 1989, after accepting the verdicts, the court excused the jury, but carefully advised them that they remained under their oath to avoid discussion or publicity regarding the trial pending further communication from the court. Jurors were not discharged from their oath until February 7, 1989. Plaintiffs were provided several days to consider the verdict and specifically ordered to advise the court as to the potential usefulness of this jury in resolving any additional issues. Plaintiffs' response to this request came in the form of a proposed judgment, filed February 3, 1989, which requested the court reconcile the verdicts without seeking clarification from the jury and find that the verdicts represented a determination that defendant was liable for punitive damages. Plaintiffs urged the court to reconvene the jury for a Phase II determination of the appropriate amount of punitive damages to be awarded. If indeed post-trial publicity had marked this jury with prejudice, plaintiffs have offered no rationale as to why presenting them with the amount of a punitive damage award would be any less tainted than clarification of the verdicts. Plaintiffs simply sought to challenge the verdict and move on with the litigation without pursuing the primary remedy provided by the rules to reconcile inconsistent verdicts.

Because this course of conduct represents a "measured, calculated trial tactic," plaintiffs have waived their objection to the alleged inconsistency. *Diamond Shamrock*, 791 F.2d at 1423; *see also Burger King Corp. v. Mason*, 710 F.2d 1480, 1489 n. 5 (11th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) (considerations for attorneys prior to discharge of jury); *Fugitt v. Jones*, 549 F.2d 1001, 1005 (5th Cir.1977).

Nonetheless, because of the potential implications of this verdict on the claims of other plaintiffs, we have considered the alleged inconsistency to determine whether allowing the verdicts to stand would be "inconsistent with substantial justice." Fed.R.Civ.P. 61; *see Diamond Shamrock*, 791 F.2d at 1423–25. We have considered and reject each assignment of error. The verdicts are consistent.

### B. Standards of Inconsistency.

■ Under Rule 49(b) of the Federal Rules of Civil Procedure, it is error to enter judgment on a verdict which includes an answer to a special interrogatory that is inconsistent with the general verdict. Pursuant to the Seventh Amendment right to jury trial, the court is under a duty to make all reasonable efforts to reconcile an inconsistent verdict and if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly. *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (reconcile verdicts "by exegesis if necessary"); *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1545 (10th Cir.1987) (citing *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1489 (11th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) (quoting *Griffin*).

A court will find jury verdicts inconsistent only when it cannot fairly harmonize the answers. *Delano v. Kitch*, 663 F.2d 990, 999 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). The test is "whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin*, 471 F.2d at

915; *see also Burger King,* 710 F.2d at 1489. The court must consider the answers as a whole and make sense of each in the context of the evidence, the charge, and the issues raised by the parties before the jury. *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106, 1122 (5th Cir. 1988); *Furr,* 824 F.2d at 1545; *Grandstaff v. City of Borger Texas,* 767 F.2d 161, 170 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). The court may find fatal inconsistency only where the verdicts are repugnant and irreconcilable. *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1424–25 (10th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

### C. *Internal Consistency—Different Standards.*

■ Plaintiffs dissect the jury instruction defining "willful or reckless" pursuant to Idaho law and conclude that the jury must have found defendant acted with conscious indifference to passenger safety. Conscious indifference is also a key phrase in the instruction defining "gross negligence" under Texas law. The analysis is the basis for the Steering Committee's theory of inconsistency as well as the objections of plaintiffs Smith, Stewart, and Spicer to the court's instruction on punitive damages. The analysis is flawed for three reasons: (1) dissection is an inappropriate means of interpreting jury instructions, (2) plaintiffs' position is inconsistent with the position taken by the Steering Committee earlier in this litigation, and (3) the position is based on a misinterpretation of Texas law. Plaintiffs overlook the fact that the jury's verdict presented findings on different levels of culpability. A finding of liability on a threshold level is not inconsistent with a finding of no liability on a higher level.

Jury instructions are read as a whole to determine the statement of the law they are designed to explain. *United States v. Grissom,* 814 F.2d 577, 580 (10th Cir.1987); *United States v. Troutman,* 814 F.2d 1428,

1451 (10th Cir.1987). The instructions given to the jury set forth this rule both at the beginning and the end of the charge. *See* Appendix B, Jury Instruction Nos. 1 and 42. Because of this principle, it is inappropriate to divide verdict responses into constituent parts based on alternative elements listed in the instructions. *See Hines v. IBG Int'l Inc.,* 813 F.2d 1331, 1334 (4th Cir.1987) (principle may require court to accept facially inconsistent verdicts).

In the instant case, the instructions were designed to present three levels of culpability, consistent with the court's research of legislative reform effecting tort law in Idaho and Texas. Prior to trial, the parties requested a ruling on their conflicting interpretations of the Idaho Code § 6–1603, which limits recovery of non-economic damages to four hundred thousand dollars ($400,000) except where the jury finds defendant to have acted willfully or recklessly. The court directed the parties to file statements of position, but chose not to rule on the issue until it became necessary at trial. The court relied on those submissions to reconcile the differences in the parties' proposed jury instructions. Essentially, defendants contended that choice of law principles as well as similar Idaho statutes indicated that the "cap" was tied to finding a defendant liable for punitive damages. When the parties commented on and objected to the court's proposed instructions, defendants reasserted their position and contended that separate inquiry on the higher Idaho standard and punitive damage liability was unnecessary and redundant. Plaintiffs' position, filed December 9, 1988, was that the Idaho statute contemplated three levels of culpability as indicated by the differing standards for punitive damage liability, enacted contemporaneously with the "cap" on non-economic damages. *See* Idaho Code § 6–1604(1). At the hearing on jury instructions, plaintiffs defended the separate inquiry.

The separate inquiry was necessary because the two tort law regimes contemplate different standards of conduct.[8] Signifi-

---

**8.** At the urging of parties, the court adopted the principle of decoupage, which means we applied the law of different jurisdictions to different issues in litigation depending on the applica-

tion of choice of law principles. *See* Order MDL 751–16, 720 F.Supp. at 1448 n. 3. This approach precludes cross-interpretation of the

cantly, the special interrogatory on "willful or reckless" conduct on Special Verdict Form A referred specifically to Jury Instruction 29, which set forth the Idaho standard. This particularized reference was designed to distinguish the standards and claims and to insure application of the appropriate standards within the proper context. For the same reason, the jury verdict distinguishing between the two standards is reconcilable, consistent, and based on clear and well articulated instructions of law.

Jury Instruction 29 is a synthesis of definitions of "willful" and "reckless" set out by the Idaho courts and tendered by plaintiffs. *See* Appendix B, Instructions of the Court; *see also Jacobsen v. City of Rathdrum,* 115 Idaho 266, 766 P.2d 736 (1988); *Hayslip v. George,* 92 Idaho 349, 442 P.2d 759 (1968); *Hodge v. Borden,* 91 Idaho 125, 417 P.2d 75 (1966); *Foberg v. Harrison,* 71 Idaho 11, 225 P.2d 69 (1950); Ida.J.I. 225. The instruction allows the jury to judge the defendant's conduct objectively, to determine whether defendant knew or had reason to know facts which would lead a "reasonable" person to realize his conduct posed a risk of harm to another.

This objective view of a defendant's state of mind has been specifically rejected by the Texas legislature as a means of determining liability for punitive damages under Texas law. Motford and Barber, *1987 Texas Tort Reform,* 25 Houston L.Rev. 245, 319–20 (1988) (quoting legislative history at length). Plaintiffs rely on *Burk Royalty v. Walls,* 616 S.W.2d 911 (Tex.1981), for the proposition that the court's instructions and the jury's verdict misrepresents the Texas standard. But the legislative history of § 41.001(5) of the Texas Code of Civil Practice and Remedies clearly states that the modified definition of "gross negligence" was designed to raise plaintiff's burden above that articulated in *Burk Roy-*

*alty.* Motford, 25 Houston L.Rev. at 320 and n. 35 (quoting statements of Sen. Gallagher). The Texas statute requires that a plaintiff "establish" defendant's "actual conscious indifference" to the safety of the plaintiff. At a minimum, the statute establishes a subjective analysis of defendant's state of mind and abrogates prior statements of Texas law which conflict with this interpretation. *Id.* Jury Instructions 30, 31, 32 and 33 quoted relevant definitions from the statute and incorporated additional statements of Texas common law, tendered by stipulation of the parties, which were not inconsistent with the intent of the legislature. *See* Appendix B; *see also* Tex. Civ.Prac. & Rem.Code § 41.001(1)–(6) (Supp.1989).

Viewed as a whole, the "willful or reckless" instruction drafted pursuant to Idaho law permitted the jury to apply an objective standard less burdensome than the Texas definition of "gross negligence" incorporated in the punitive damage instructions. The jury's finding that plaintiffs met their burden under the Idaho statute is not inconsistent with its finding that they had not met the higher Texas burden.[9] The findings represent logical and probable decisions on "shadings of fault which courts often ask jurors to make." *Fugitt v. Jones,* 549 F.2d 1001, 1005 (5th Cir.1977) (analyzing differing culpability standards under Texas punitive damage law before tort reform).

D. *Internal Consistency—Different Claims.*

■ The verdicts are also consistent because they represent findings on separate claims. Where separate and distinct causes of action are tied together, verdicts awarding recovery on one theory and not on another are not necessarily inconsistent. *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1424–25 (10th

---

verdicts. In an era of legislative redefinition of common law tort principles, it would be improper to apply the standards adopted by one state within the legal framework applied by another jurisdiction.

**9.** Plaintiffs Smith, Stewart, and Spicer further object to the inclusion of two inquiries on puni-

tive damages within Special Verdict Form C— one on gross negligence and one on malice. *See* Appendix A, Special Verdict Forms. Both inquiries are necessary under the Texas statute which imposes a limitation on punitive damages unless a plaintiff demonstrates malice in addition to gross negligence. Tex.Civ.Prac. & Rem. Code § 41.008.

Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986). In this case, Special Verdict Forms A and B inquired about compensatory damage claims on defendants confessed liability for negligence. The "willful or reckless" inquiry was incorporated in Special Verdict Form A on compensatory damages. The jury was not instructed that their verdict implicated Idaho's limitation on damages, however. *See* Idaho Code § 6–1603(3). The "gross negligence" inquiry was incorporated in Special Verdict Form C and specifically inquired whether defendants "should be assessed punitive damages." The arrangement of the verdict forms, applicable instructions, and inquiries indicate that the questions were designed to separate claims for punitive and compensatory damages. In these circumstances, a jury's decision not to punish is not inconsistent with its characterization of a defendant's conduct within the context of a different claim. *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1545 (10th Cir.1987) (citing *Fugitt v. Jones,* 549 F.2d 1001, 1005 (5th Cir.1977)).

Plaintiffs concede that Texas law provides the jury with the discretion to determine whether punitive damages should be assessed. Plaintiffs contend that reconciliation of the verdicts on this basis is inappropriate in this case, however, because the jury was precluded from exercising this discretion until Phase II of the stipulated trial plan. Under the trial plan, if the jury were to find liability for punitive damages during Phase I, it would reconvene to determine the amount of punitive damages to award during Phase II. *See* Order MDL 751–17, 720 F.Supp. at 1459. Plaintiffs contend that the issue of whether to award punitive damages would be more appropriately expressed through a nominal award during Phase II of the trial plan. Plaintiffs contend further that confusion between the proofs necessary to each phase prejudiced their presentation on punitive damages. We address the latter objection below. For the purposes of interpreting and reconciling the verdicts assigned as error, we find only that the issue of whether punitive damages should be assessed was presented to the jury through Jury Instruction 30 and Special Verdict Form C and that plaintiffs acquiesced to the submission as appropriate. *See* Appendices A and B.

Where a party fails to make a timely objection to the giving of an instruction at trial, the party is deemed to have waived objection to placing issue before the jury. *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1274 (10th Cir. 1988). Where a party approves special verdict forms and does not request separate submission of an issue, the party waives the right to a separate jury finding on the issue. *Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1337 (10th Cir.1984). Plaintiffs' failure to object to the verdict form incorporating what they now contend was a Phase II issue—whether punitive damages should be awarded—amounts to an implicit admission that the issue was appropriately before the jury during Phase I. The verdicts are consistent in that they represent findings on different claims, the second including the additional finding that defendants should not be assessed punitive damages.

## IV. PRESENTATION OF PUNITIVE DAMAGE CLAIMS

Plaintiffs' motions for new trial present three general categories of alleged error which they contend prejudiced the Steering Committee's ability to prove liability for punitive damages. Plaintiffs contend their presentation was prejudiced (1) by confusion regarding the allocation of proofs between Phase I and Phase II of the trial plan, (2) by improper preclusion of evidence and instructions on the joined claims for liability, and (3) by directing verdict in favor of Texas Air Corporation on plaintiffs' theory of intercorporate vicarious liability. We have considered and reject plaintiffs' claims of error and prejudice on the conduct of trial.

### A. *Punitive Damages and Mass Tort Litigation.*

The Plaintiffs Steering Committee argues that the court precluded the participation and acknowledgment of the existence of joined plaintiffs and claims, thereby

prejudicing claims for punitive damages. They move the court to set aside the Johnson verdict on these grounds. Plaintiffs' theory of prejudice is unclear. The Steering Committee contends that the jury had "no idea of what the case was all about," that the jurors were unaware that the claims of other parties existed, or that their decisions would affect those claims. Plaintiffs Smith, Stewart, and Spicer contend that the court violated a duty to protect the interests of all consolidated plaintiffs by precluding the fact of their existence from the jury.

Plaintiffs direct our attention to two alleged points of error which they contend permitted the jury to view the Johnson punitive damage claims in isolation: (1) the court failed to instruct the jury that its decision would be binding on other claimants, and (2) the court precluded evidence of the existence of other claimants. Even if the trial could be characterized as having been conducted in this manner, a proposition clearly contrary to the record, at no point during the trial did the plaintiffs articulate their theory that instructions or evidence in this regard were essential to their claims for punitive damages. The grounds for plaintiffs' current objection to the conduct of trial was not raised until after the jury began its deliberation. *Cf.* Fed.R.Civ.P. 51 (party required to object to jury instructions by succinct statement of objection and grounds therefor). Nonetheless, because of the potential implications of this verdict, we treat each of plaintiffs' allegations of error in turn. *See* Fed. R.Civ.P. 61.

### 1. Instructing the Jury on the Multidistrict Verdict.

■ Plaintiff tendered a two-page statement of the case which set forth claims, defenses, and non-party fault issues and incorporated a short statement of the legal implications that certain verdicts would have on other unnamed claimants. The court generally accepted plaintiffs' form, but redrafted the language to take on a more neutral tone. The legal ramifications of the verdict were omitted to avoid unnecessary juror confusion.

Deletion of this paragraph from the jury instructions did not prejudice the joined claims of all plaintiffs. The joined exemplary damage issues to be resolved during this phase of the litigation turned on the character of defendant's conduct and whether defendant should be punished for that conduct. In fact, we found the claims of all plaintiffs suitable for joinder expressly because defendant's conduct and concern for each passenger on Flight 1713 was necessarily identical—each would suffer the same consequences of a reckless act. *See* Order MDL 751-17, 720 F.Supp. 1455, 1458-59 (D.Colo. Nov. 29, 1988). As we note below, to the extent that the number of passengers bore on the defendant's duty of care, that evidence was before the jury.

The jury instructions were designed to provide the jury with guidelines for determining whether defendant had demonstrated a level of indifference to passenger safety deserving of punishment under the law. Plaintiffs cite no authority to suggest that a jury deliberating on joined liability claims in mass disaster litigation must be instructed as to the procedural ramifications of their verdict. We reject the proposition that the court had a duty to instruct the jury on the joinder issue in this case.

Jury instructions must be viewed in the context of the statements of the court and counsel in opening, closing and throughout the course of this hotly contested three week trial to determine whether the jury was aware of the existence of other victims and claimants. *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 682 (10th Cir.1981). When the presentation of trial is viewed in context, it is clear that the jury was advised and well aware of the nature of this litigation and the existence of other claimants. At the close of voir dire, the court advised the jury that the case was being tried as an exemplar case by the Plaintiffs Steering Committee and that their decision would effect certain claims of other passengers. Plaintiffs' counsel introduced themselves to the jury at that time, and throughout trial, as either representing the Steering Committee, Ms. Johnson, or both. A theme of plaintiffs' opening and closing remarks was that the "eyes of Boise" were upon the Denver courtroom. In closing, Mr. Breit, speaking for the Steering Committee on liability issues, began by stating

that he was privileged to represent the passengers of Flight 1713 before the jury. Mr. Comstock, representing Ms. Johnson on damage issues as well as the Steering Committee, specifically informed the jury that its verdict would effect the claims of the other passengers and urged the jury to avoid being distracted from the reality of Ms. Johnson's injuries by the complexity of the concept of an exemplar trial.[10] Furthermore, as each of several passengers testified, defendants' cross-examination inquired as to whether the witness also had claims pending in this litigation. Finally, the wording of the instructions in totality, a copy of which was provided to each juror during deliberation, did not instruct the jury to view Ms. Johnson's punitive damage claims or other liability claims in isolation—liability claims and verdict form questions used the universal term "plaintiffs," only damage issues referred to Ms. Johnson or her husband by name. *See Richards v. Attorney's Title Guaranty Fund, Inc.,* 866 F.2d 1570, 1573 (10th Cir. 1989) (released for publication) (language of instructions lies in the discretion of the trial court).

There is no foundation for alleging juror ignorance of the multidistrict claims before them. The deletion of one paragraph the court's final instructions cannot nullify the full weight of the record.

### 2. Evidence of Other Air Crash Victims.

■ Plaintiffs were afforded wide latitude in presenting considerable evidence regarding the number of individuals affected and their experiences during the crash and rescue of Flight 1713.[11] Much of this testimony would have been inadmissable as overly cumulative at a trial of only Ms. Johnson's claims. *See* Fed.R.Ev. 403. In light of this evidence, we find no foundation for plaintiffs' allegations that either Ms. Johnson's own claim for punitive dam-

ages or the joined claims for punitive damages were somehow prejudiced by preclusion of reference to the existence of other passengers.

First, we reject the initial premise that the case was limited to trial of Ms. Johnson's claims alone. Ten passengers and one flight attendant testified about their experiences prior to, during and immediately after the crash of Flight 1713. The passengers testified to three general areas of evidence: (1) conduct of the Continental ground maintenance crew, the long waiting period between deicing and take off as well as the conduct and conversations of the cockpit crew during that time, (2) the terrifying effect of impact on the cabin and other passengers, and the panic of passengers immediately following the crash, and (3) witnesses' personal efforts and the efforts of emergency workers during the rescue, the manner in which the survivors were huddled in the snow pending arrival of buses for transport to local hospitals, and the problems of one group of passengers who suffered the additional discomfort of having their bus stuck in the snow on the runway during the evacuation. The only testimony these passengers and plaintiffs were precluded from presenting went to their lasting physical and emotional injuries.

Of the evidence presented, only that of category (1) above was strictly relevant to Ms. Johnson's individual claims. That evidence established and corroborated the deice procedures, the existence of ice on the wings, etc. The second and third categories sufficiently set forth the fact that the crash impacted a significant number of individuals as it had Ms. Johnson.[12] The rescue efforts of passengers who had no contact with Ms. Johnson would have been inadmissible in a trial of her claims alone. Evidence was admitted in an liberal manner, in accordance with the clearly understood format for trial of joint claims for punitive damages.

---

**10.** Both Mr. Comstock and Mr. Breit represent a number of other plaintiffs in this multidistrict litigation.

**11.** Approximately sixty (60) witnesses testified in person, by deposition, deposition summary, or videotape deposition.

**12.** Arguably, the evidence regarding post-crash panic and the rescue operation had no bearing on Ms. Johnson's damage claims. Perhaps to her psychological benefit, as argued by Mr. Comstock, Ms. Johnson was asleep as Flight 1713 began its take-off run and crashed and was unconscious throughout the rescue.

Accordingly, we view plaintiffs as contending that the punitive damage claims of Ms. Johnson as well as all joined plaintiffs were prejudiced not because the court excluded evidence of all other claims and claimants, but because the court failed to admit *enough* evidence of other claims and claimants. Here again, however, plaintiffs set forth no theory of prejudice. The only way a claim for punitive damages against a common carrier might require evidence of the magnitude of the crash is on the theory that the number of passengers effected by certain conduct raises the standard of care a common carrier owes to all passengers. In this regard, abundant evidence and a clearly worded instruction of law regarding the common carrier's "highest standard of care" placed defendant's conduct in the appropriate context for the jury.[13] *See* Appendix B, Jury Instruction No. 15.

Counsel for plaintiffs overlook the fact that as each passenger testified, his or her seat was identified and marked on a schematic of the cabin distributed to each juror for reference during the testimony. *See* Appendix C, Passenger Seating Schematic. The schematic also went to jury room during deliberations. Each passenger also identified their location after the plane came to rest on two poster-size photographs of the wreckage, photographs which were exposed to the jury for a large portion of the trial.

Testimony clearly documented the tragedy of the crash and its aftermath in graphic detail. Mr. David Daniel, an Idaho high school agriculture teacher, testified to the fact that he, his wife, and a number of his students boarded Flight 1713 in Denver. Counsel's closing arguments reiterated the guilt Mr. Daniel feels for having assigned seats to his wife and students. Mr. Daniel testified to the lengthy period required to extricate him from the wreckage, to his

frustration at being unable to determine the location or condition of his students, to the fact that he lay pinned with his head to his wife's back during this period, and to the fact that he and his wife communicated briefly until she died shortly before they were rescued. A flight attendant, Ms. Kelly Englehart, described the crash from her perspective at the end of the aisle, viewing the entire cabin full of passengers, and to her concerns prior to the accident over Continental's commitment to passenger safety in the broadest sense. Mr. Richard Case testified to the fireball and fuel that moved through the cabin during the horrifying accident. Ms. Johnson's emergency room surgeon testified that local hospitals, including Fitzsimmons Army Medical Hospital, invoked mass disaster procedures in response to the crash and to the state of organized confusion in which patients were admitted to the hospital.

Only when passengers began to testify as to the lasting physical and emotional trauma they suffered did the court sustain objection and preclude further testimony. At no point during trial did plaintiffs contend that the court had excluded essential or, for that matter, relevant evidence from their case. This evidence is only relevant to individual damage claims which were neither at issue nor consolidated for trial during this phase of the litigation. The evidence presented at trial made it abundantly clear that Continental's conduct effected a planeload of passengers. While the court prevented lengthy litigation of the actual damages suffered by each passenger whose claims for liability were pending, the court consistently and carefully allowed testimony to establish the fact that even a momentary lapse of care in the operation of a airliner effects each of the passengers in complex, diverse, and horrible ways.[14] Complete presentation of Ms. Johnson's injuries exemplified the extent of

**13.** It should be noted that because defendants had conceded their own liability for negligence, the common carrier standard of care was applicable only as a barometer for measuring defendant's conduct in regard to the punitive damage claims. The instruction served as a theme in Mr. Breit's closing argument on liability for punitive damages.

**14.** Plaintiffs also object, post-trial, to the presentation of testimony by some passengers in summary form. Again, because the practice was applied without objection, the approach was construed an agreeable means of expediting testimony at trial. Defense witnesses as well as plaintiffs' witnesses testified in summary form. The approach was applied during the testimony of no more than two passengers. Summary presentation of testimony allows counsel to

those effects. In fact, in proposing the Johnson case for the exemplar trial, the Plaintiffs Steering Committee asserted that Ms. Johnson's claims were specifically chosen to shed light on the tragedy of defendant's alleged indifference to passenger safety.

Viewed in context, this evidence clearly established that a common carrier's conduct must be judged in light of the large number of individuals potentially effected by it. This point was furthered by the opening and closing statements of counsel and the opinion testimony of plaintiffs' experts in airline operations. The point was also made to the jury through plaintiffs' tendered instruction that a common carrier bears the highest standard of care to its passengers.

At issue in the individual and joint claims for punitive damages was whether defendants conduct required punishment. To the extent that these claims had to be viewed in the context of the number of people effected by that conduct, evidence as well as legal and industry theories of responsibility were before the jury. Not only are plaintiffs' allegations of complete preclusion unfounded, but they have failed to demonstrate how limitations the court did implement prejudiced their presentation on punitive damage liability in any way.

B. *Division of Proof and the Stipulated Trial Plan.*

■ As mentioned above, plaintiffs contend that the court improperly permitted the jury to make a discretionary finding against the award of punitive damages when the trial plan for those claims allocated that decision to Phase II of this litigation. Plaintiffs contend that if the trial plan did contemplate that the Phase I jury would go beyond merely characterizing defendant's conduct to determine whether pu-

nitive damages were to be assessed, confusion over the allocation of issues between the two phases prejudiced their ability to prepare and present evidence during Phase I. Plaintiffs mischaracterize a well designed procedure established by the court upon agreement of defense counsel with Plaintiffs Steering Committee, represented by Ms. Johnson's own attorney.

A brief review of the submissions of the parties and orders of the court regarding the stipulated trial plan demonstrates that the court and the parties maintained a consistent view of what issues would be placed before the jury in each phase. On October 31, 1988, the parties jointly filed trial plans which used the same language to distinguish between Phase I and Phase II of the exemplar trial:

"Phase I would further consist of liability for punitive damages, if any. This phase of the trial would exclude any evidence bearing on the amount of punitive damages. The jury would determine the issue of liability, if any, and compensatory damages, if any. Following this determination, the jury would indicate by answers to special interrogatories *whether punitive damages are justified .... Phase II would exist only if the jury determines that punitive damages are justified.* If so, the Court would reconvene the jury to hear evidence bearing on the amount of punitive damages." (emphasis added).

The court specifically adopted the parties' approach to the bifurcation of punitive damages into liability and amount phases at hearings on the trial plan and in subsequent orders. *See* Order MDL 751–16, 720 F.Supp. 1445, 1453–54 (D.Colo. Nov. 15, 1988); Order MDL 751–17, 720 F.Supp. 1455, 1459 n. 2 (D.Colo. Nov. 29, 1988); Order MDL 751–18, 720 F.Supp. 1455, 1464 (D.Colo. Dec. 2, 1988).[15]

present a statement of the witnesses testimony, the witness, sworn and on the stand, is then given an opportunity to supplement or correct the statement, and her testimony then proceeds through cross and rebuttal examination. Summary testimony is recommended for presentation of certain evidence in complex cases and counsel was advised of the court's intention to apply the approach during Status Conferences and in written orders. *See* Order MDL 751–17, at 1461; *Manual for Complex Litigation, Second,*

§ 22.332 (1985). Furthermore, "the court has the inherent power to develop tools to promote the efficient presentation of [evidence]." *Nigh v. Dow Chemical Co.,* 634 F.Supp. 1513, 1518–19 (D.Wis.1986) (discussing practices including presentation of testimony in summary form).

**15.** In an untimely reply filed in support of their motion, the Smith, Stewart, and Spicer plaintiffs represent that consolidation of liability claims

The dispute which arose during trial related only to the manner in which evidence would be presented as to issues allocated to Phase II. Texas law requires that any punitive damage award against defendants would have to bear a reasonable relationship to the aggregate amount of actual damages attributable to defendant's misconduct. *See* Order MDL 751–16, 720 F.Supp. 1445, 1453–54 (D.Colo. Nov. 15, 1988). During discussion on the trial plan at an October 25, 1988 Status Conference, plaintiffs represented that they would establish this base amount with evidence of the actual injuries of the various claimants rather than through attorney generated summaries and estimates, the latter being a practice to which defendants specifically objected. Immediately before trial, defendants reviewed court orders and expressed concern that the court intended to allow "estimates" to be admitted during Phase II. Defendants filed a motion for clarification. Although the trial plan had originally been negotiated and tendered by Mr. Comstock for the Steering Committee, plaintiffs responded during trial with a statement written by Mr. Moller. The statement indicated a retreat from plaintiffs' October 25th representation that actual evidence rather than "estimates" would be presented during Phase II. The court referred counsel to the transcript of that hearing and urged them to reconsider their position.

This dispute, and plaintiffs alleged confusion, related only to the practical aspects of proving the elements of punitive damages under Texas law. At no time through the course of the litigation did the court or the parties stray from their original course of trying the elements of liability for punitive damages during Phase I and the elements of determining the amount of damages during Phase II. *Compare* Tex.Civ.Prac. &

Rem.Code §§ 41.001, 41.003 (Supp.1989) (elements of liability) *with Alamo National Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981) (elements of amount). Plaintiffs do not contend that the implementation of the trial plan precluded any evidence going to any of the statutory elements of liability for punitive damages. Neither the trial plan nor the court's implementation of that plan precluded plaintiffs from presenting evidence of defendant's conduct in the context of its responsibility to the passengers and claimants during Phase I of this litigation.

### C. *Dismissal of Claims Against Texas Air Corporation.*

██ The Steering Committee also contends that its ability to prove the appropriate amount of punitive damages to be awarded was prejudiced by the court's dismissal of claims against Texas Air Corporation at the close of plaintiffs' case. Texas law permits introduction of evidence of a defendant's wealth as a basis for arriving at a punitive damage award. Because we find no reason for new trial on the jury's finding that an award of punitive damages was not justified, plaintiffs' objections are not truly in issue.

Plaintiffs' claims against Texas Air were based solely on the theory that its wholly-owned subsidiary, Continental Airlines, Inc., was a mere instrumentality of the parent corporation requiring the court to impose liability on the parent for the conduct of the subsidiary. Colorado law is consistent with general common law on the circumstances in which courts will disregard separate corporate identities. *See Micciche v. Billings,* 727 P.2d 367, 372–73 (Colo.1986); *Fink v. Montgomery Elevator Co.,* 161 Colo. 342, 421 P.2d 735, 739 (1966) (quoting 1 Fletcher, *Cyclopedia of Corpo-*

---

and adoption of the stipulated trial plan was expressly objected to by all plaintiffs. The record in this litigation actually indicates that *no* plaintiff filed an objection to the proposal or argued any objection during one of the several status conferences at which the issue was discussed. In their proposed Pretrial Orders, the parties advised the court of the several trial plans then under consideration and the procedural steps necessary to implement each varia-

tion. Notice of the consolidated approach to liability was provided initially in the Pretrial Order entered in all cases September 1, 1988. Notice of formal consolidation was provided through the comprehensive trial practice order entered in all cases November 29, 1988, seven weeks prior to trial. No plaintiff filed or argued any objection or motion for reconsideration of either order.

*rations* § 41.1); *New Sheridan Hotel & Bar, Ltd. v. Commercial Leasing Corporation, Inc.*, 645 P.2d 868, 869 (Colo.App. 1982); *see also* Krendl and Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 Den.L.J. 1 (1978). As a factual predicate to disregarding the corporate form, plaintiff must establish such a close relationship between parent and subsidiary that one is nothing more than a mere instrumentality of the other. *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1378 & n. 4 (10th Cir.1980) (citing factors to be considered); *Edgar v. Fred Jones Lincoln–Mercury, Inc.*, 524 F.2d 162, 165 (10th Cir.1975); *New Sheridan*, 645 P.2d at 869 (citing *Fish v. East*, 114 F.2d 177 (10th Cir.1940)). But the ultimate decision of whether to disregard the corporate form, and the underlying public policy on which it is based, lies in equity. *Micciche*, 727 P.2d at 373; *Lafond v. Basham*, 683 P.2d 367, 369 (Colo.App.1984). "A court will disregard the corporate entity where fraud or illegal or inequitable conduct is the result of the use of corporate structures." *Luckett*, 618 F.2d at 1379. To this end, the issue of whether adherence to the corporate form promotes injustice may be a matter for the court. Indeed, in the absence of a stipulation between the parties that the verdict will be final, some courts treat a jury verdict on the issue merely as an advisory opinion. *See* 1 Fletcher, *Cyclopedia of Corporations* § 41.25 (Supp.1987) (citing cases).

Regardless of the standard to applied to defendants' motion for directed verdict, however, plaintiffs failed to adduce facts demonstrating that Continental Airlines, Inc. is a mere instrumentality of Texas Air. Plaintiffs relied on the contents of the 10–K forms filed by the corporations with the Securities and Exchange Commission and on testimony of certain corporate officers. While the 10 K's necessarily disclosed common officers and directors, intercorporate loans and contracts, and the fact that Texas Air's business as a holding company was the business of Continental and its other airlines and subsidiaries, they also demonstrated that Texas Air and its subsidiaries maintain strict observance of the corporate formalities which separate the

corporations. Similarly, testimony regarding the involvement of managers holding positions in both corporations did not suggest that those managers operated Continental as a mere instrumentality of Texas Air. This factual predicate is insufficient to provide cause to disregard the corporate structure. *Luckett*, 618 F.2d at 1378.

What is most significant, however, is that plaintiffs, given several opportunities to respond to the motion for directed verdict, failed to present facts or to articulate a theory that continued recognition of the corporate form would promote fraud, illegality, or injustice. *See United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir. 1987) ("plaintiff bears the burden of demonstrating that some injustice or inequity will result from recognition of the corporate entity."). Plaintiffs did not demonstrate that Texas Air's domination of Continental caused the subsidiary to take actions leading to the crash. *See, e.g., Garden City Co. v. Burden*, 186 F.2d 651, 653 (10th Cir.1951); *New Sheridan*, 645 P.2d at 869. Plaintiffs did not demonstrate and do not now allege that adherence to the corporate form would prevent or frustrate their ability to recover from a corporate tortfeasor. *See, e.g., Luckett*, 618 F.2d at 1379; *LaFond*, 683 P.2d at 369. Nor did plaintiffs contend that adherence to the corporate form would promote injustice by permitting a culpable party to avoid liability simply by raising the corporate form. *See, e.g., Van Diviner*, 822 F.2d at 965; *Fish*, 114 F.2d at 190. Plaintiffs failed to meet their burden. On the facts presented, it would have been error for the court to disregard the corporate form separating Texas Air from its subsidiary. *Van Diviner*, 822 F.2d at 965.

### D. *Conclusion–Punitive Damage Issues.*

For the reasons set forth above, we see no reason to order a new trial on plaintiffs' claims for punitive damages or against Texas Air Corporation.

## V. VERDICTS CONTRARY TO EVIDENCE OR LAW

The Steering Committee also contends that a new trial is warranted in the John-

son case in particular because the jury's verdict (1) awards grossly inadequate damages against the weight of the evidence, and (2) is clearly against the weight of the evidence on liability under the Texas Deceptive Trade Practices Act. Motions for new trial on the basis of inadequate damages or verdicts contrary to the weight of the evidence necessarily require a review of the facts presented at trial and thus are committed to the sound discretion of the trial court. *Black v. Hieb's Enterprises, Inc.*, 805 F.2d 360 362–63 (10th Cir.1986); *see also Suggs v. State Farm Fire and Casualty Co.*, 833 F.2d 883, 887 n. 5 (10th Cir.1987) (federal standards apply to motions for new trial in diversity cases), *cert. denied,* —— U.S. ——, 108 S.Ct. 1732, 100 L.Ed.2d 196 (1988). We have considered the verdicts in light of the evidence presented and find that the jury's verdict reflects a deliberate consideration of the evidence within the court's instructions of law. Accordingly, we deny plaintiffs' motion for new trial on these grounds.

### A. *Compensatory Damages.*

Pursuant to Idaho law, Special Verdict Form A required the jury to allocate its compensatory damage awards between economic and non-economic damages. *See* Appendix A, Special Verdict Forms. Plain-

tiffs challenge the economic and non-economic damage awards to Karen Johnson and the non-economic damage award to Robert Cooke, Jr. They contend these verdicts are the result of bias against these plaintiffs or against the policies underlying legal principles of compensation.[16] Consistent with the law of the Tenth Circuit, plaintiffs attempt to show prejudice by demonstrating a broad divergence between injury and award. *Black*, 805 F.2d at 362 (quoting *Barnes v. Smith*, 305 F.2d 226, 228 (10th Cir.1962) (propriety of award tested through comparison to injuries)). None of the award figures is so inadequate as to shock the judicial conscience and raise an irresistible inference of passion, prejudice or bias. *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir.1985); *Barnes*, 305 F.2d at 228. Nor are the amounts clearly, decidedly, or overwhelmingly against the weight of the evidence. *Black*, 805 F.2d at 363. Absent such indicia that "improper cause invaded the trial, the jury's determination of the fact is considered inviolate." *Barnes*, 305 F.2d at 228.[17]

The jury awarded Ms. Johnson $779,000 in damages, $204,000 in economic damages and $575,000 in non-economic damages. The jury awarded Mr. Cooke $21,700 in derivative damages for loss of consortium,

**16.** Plaintiffs contend that they can only speculate as to the "hidden agenda" of jurors who "ignore[d] substantial and compelling evidence" of damages because "this court's voir dire failed to probe the potential jurors' attitudes regarding compensatory damages." Plaintiffs' objection is wholly without merit. The voir dire in this case was comprehensive, clear and fair and, we note, complimented by plaintiffs' counsel. The jury responded to an eight-page questionnaire which inquired, in part, as to the involvement of the venireman or her family in prior litigation, traffic, aircraft or industrial accidents, the insurance industry, etc. The court then interviewed a panel of 20 in open court with regard to their answers. Counsel were provided copies of the voir dire questionnaires and were invited at bench conferences to suggest additional inquiry on any member of the panel. In fact, plaintiffs' concern for advertisements and materials distributed by the insurance industry in Colorado near the time of trial caused the court to invite one panel member to the bench, at the behest of plaintiffs, to inquire about contact with the materials and the effect they may have had on her perceptions of injury and compensation. The voir dire was more than sufficient to reveal the

types of juror prejudice with which plaintiffs are concerned. *See McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 550 n. 2, 554, 104 S.Ct. 845, 847, n. 2, 849, 78 L.Ed.2d 663 (1984) (party barred from post-trial challenge of jury composition by failure to seek further interrogation during voir dire).

**17.** The basis for these standards of deference was set out by then Chief Justice McWilliams, of the Colorado Supreme Court, now of the Tenth Circuit Court of Appeals, in *Gibbons v. Choury*, 169 Colo. 267, 455 P.2d 649, 650 (1969): "If we were to set aside every verdict that may seem to us a bit high, then by the same token we should also set aside those verdicts that from time-to-time strike us as being niggardly. And then the courts, and not the juries, would for all practical purposes be in effect fixing the dollar amount in all personal injury cases. On the contrary, Colorado has long been committed to the rule that a verdict of a jury in a personal injury case is not to be set aside unless the damages awarded are grossly and manifestly excessive or, on the other hand, are grossly and manifestly inadequate."

$13,200 in economic damages, $8,500 in non-economic damages.

### 1. Economic Damages.

■ Plaintiffs contend that the economic damage award to Ms. Johnson is far below the range of possibilities established by their economic expert on lost earnings. Although the expert's theories rested on various assumptions as to professional advancement and Ms. Johnson's potential for a second career as an author, the court allowed the theories to be placed before the jury as long as these variables and assumptions were also clearly before the jury. One of these variables required the jury to accept the additional testimony of medical experts that Ms. Johnson's physical recovery from the accident was complete and that her job performance would never rise above its current part-time status. Another was plaintiffs' theory of cognitive aphasia, or brain damage limiting Ms. Johnson's ability to select and retrieve the best word from her memory. Plaintiffs contend that their case on these issues was uncontroverted. Defendants characterized all facets of Ms. Johnson's recovery as demonstrating a trend of improvement which had yet to run its course, however.

The jury was instructed that they were the sole judges of witness credibility, on the distinction between possibilities and probabilities, and on the fact that damages need not be proven to a certainty. Plaintiffs' damage theories turned on assumptions which the evidence may or may not have established. When a verdict turns on theories of future damages presented by expert witnesses based upon such assumptions, the testimony of those experts is appropriately left to the considered discretion of the jury. *See Moe v. Avions Marcel Dassault–Breguet Aviation,* 727 F.2d 917, 929–30 (10th Cir.) (accident causation), *cert. denied,* 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984); *Estes v. Southern Pacific Transportation Co.,* 598 F.2d 1195, 1199 (10th Cir.1979) (injury causation); *Hamm v. Consolidated Rail Corp.,* 582 F.Supp. 906, 909–10 (E.D.Penn.1983) (physical impairment and recovery), *aff'd,* 729 F.2d 1447 (3d Cir.1984); *Gagliano v. Ford Motor Co.,* 551 F.Supp. 1077, 1078–79 (D.Kan.1982) (lost earnings).

Although the jury's award of economic damages may not be consistent with any of plaintiffs' theories, we cannot assume on a motion for new trial that the jury necessarily accepted underlying assumptions based on ambiguous evidence of physical recovery. *See Black,* 805 F.2d at 363; *Gagliano,* 551 F.Supp. at 1079 ("The jury could choose to believe the testimony as to future medical expenses and past and future lost wages as they saw fit."). Ms. Johnson proved past expenses in the amount of approximately $50,000 at trial. *See* Exhibits 462 and 463. An award of $150,000 for future medical expenses and past and future lost earnings is within the range of possibilities established by removing one or more of the assumptions plaintiffs' experts incorporated into their economic models. *See Narcisse v. Illinois Central Gulf Railroad Co.,* 620 F.2d 544, 547 (5th Cir.1980) (basis for comparison should reflect range of possibilities presented by evidence).

### 2. Non-economic Damages.

■ Plaintiffs also challenge the award of non-economic damages to both Mr. Cooke and Ms. Johnson. They contend the awards are unconscionable as against great evidence of the physical, emotional and psychological suffering the crash caused Ms. Johnson, through her own injuries, and Mr. Cooke, through changes in his marital relationship. The pain and indignities the couple related at trial were considerable and need not be repeated in this order.

As plaintiffs contend, the necessary correlation between award and damages generally requires a more substantial finding than defendants' assertion that the awards in this case are more than *de minimis.* Unlike the economic damages discussed above, however, we have no base figure from which extrapolate a range of possible outcomes. A jury verdict only slightly above fixed or past actual damages indicates prejudice, compromise, bias or disregard for the court's instructions on non-economic damages. *See Skinner v. Total Petroleum, Inc.* 859 F.2d 1439, 1145–46 (10th Cir.1988); *Evans v. H.C. Watkins Memorial Hospital, Inc.,* 778 F.2d 1021, 1022 (5th Cir.1985); *Venes v. Heck,* 642

F.2d 380, 383 (10th Cir.1980); *Brown v. Richard H. Wacholz, Inc.*, 467 F.2d 18, 21 (10th Cir.1972); *Zerr v. Trenkle*, 454 F.2d 1103, 1105 (10th Cir.1972). Absent other indicia that the jury's consideration of these issues was somehow corrupted, these cases demonstrate that courts determine the adequacy of an award by reviewing (a) conscientiousness of the jury, (b) skill evidenced by counsel, and (c) existence of a greater than nominal award of non-economic damages. *See also Barnes*, 305 F.2d at 228–29; *Cheney v. Moler*, 285 F.2d 116, 117–18 (10th Cir.1960).

The jury was dedicated and attentive. For three weeks, the jury convened for trial days averaging ten hours. Setting its own schedule, the jury continued this approach during their three and one half days of deliberation. The jury reviewed videotapes related to claims addressed in the last verdict form shortly before returning its verdicts. The case was also avidly litigated by skilled counsel. Plaintiffs' case was well plead and professionally presented. Defense counsel carefully reviewed the damage evidence for the jury. Finally, the non-economic damage awards do not indicate that the jury disregarded the concept of compensation for non-economic loss set forth in the court's instructions of law. The awards cannot be termed nominal in proportion to the economic damages assessed by the jury.

### 3. Conclusion—Compensatory Damage Issues.

For the reasons set forth above, neither the award of economic or non-economic damages to Ms. Johnson, nor the award of non-economic damages to Mr. Cooke are so inadequate as to shock judicial conscience or to raise an irresistible inference of prejudice, bias, or passion.[18] We may not grant plaintiffs' motion for new trial on the issue of damages. *Black*, 805 F.2d at 362.

### B. *Causation Under the Texas Deceptive Trade Practices Act.*

The final assignment of error on which plaintiffs base their motion for new trial challenges the jury's finding that deceptive trade practices on the part of defendant Continental Airlines did not cause Karen Johnson's injuries. Plaintiffs do not contend that the jury was improperly instructed on the issue of causation under the Texas Deceptive Trade Practices Act. *See* Tex.Bus. & Comm.Code § 17.50(a) (consumer action lies where enumerated deceptive acts "constitute a producing cause of actual damages"). Plaintiffs contend instead that the jury's verdict is contrary to the sole and undisputed evidence of causation presented at trial, Karen Johnson's testimony.

For the purposes of this motion, we will accept plaintiffs' construction of the case law defining the standard of "producing cause." Plaintiffs bore the burden of demonstrating that Karen Johnson was induced to purchase her ticket for travel on Continental Airlines, in whole or in part, by the trade practices the jury found to be false and deceptive. *See Pope v. Rollins Protective Services Co.*, 703 F.2d 197 (5th Cir. 1983); *Riojas v. Lone Star Gas Co.*, 637 S.W.2d 956 (Tex.App.1982).

Ms. Johnson's testimony on her exposure to Continental's advertising and her considerations in purchasing the ticket was the only evidence presented to the jury on the issue of "producing cause." The gist of the testimony was that Ms. Johnson investigated the airlines serving a route she was required to travel for work, in part through review of advertisements, from the perspective of a conscientious employee seeking affordable, convenient and accommodating services to the business traveler. While Ms. Johnson testified she had researched the entirety of Continental's 1987

---

**18.** Plaintiffs' final argument on the issue of inadequate damages suggests the proposition that an award should shock judicial conscience when it proves to be far below a defendant's last settlement offer. Even if such evidence were admissable in federal court, *see* Fed.R.Ev. 408, an offer higher than the ultimate verdict provides no more basis to find a verdict inadequate than would a plaintiff's final settlement demand far below an award alleged to be excessive. *See Hamm v. Consolidated Rail Corp.*, 582 F.Supp. 906, 910 (E.D.Penn.1983) ("Under our system of jury trials, litigants inevitably run the risk that the jury's determination of the amount of damages may vary substantially from reasonable expectations of the litigants.").

advertising campaign, she made no specific reference to the safety advertisements later presented to the jury as deceptive. Ms. Johnson's only reference to safety came as she listed the "messages" she received from Continental's ads, stating "you would have a safe and pleasant experience flying." The remainder of Ms. Johnson's testimony went to the airline's appeal to the business traveler through services and promotions. The record simply does not indicate that the jury's verdict is clearly, decidedly or overwhelmingly against the weight of the evidence showing the factors that induced her to purchase tickets for travel on Continental Airlines. *See Black*, 805 F.2d at 363. The jury was instructed that it was the sole judge of the credibility of witnesses. The jury, as trier of fact, may reject even uncontradicted testimony where indicia of credibility, including the demeanor and interest of the witness, weigh against sincerity or accuracy of recollection. *Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.*, 772 F.2d 505, 514 n. 8 (9th Cir.1985) (citing cases); *Peterson v. United States*, 723 F.2d 43, 45 (8th Cir. 1983). Credibility is best left to the trier of fact where the testimony of a plaintiff goes to a central issue like causation on which the witness knows she bears the burden of proof. *Matter of Decker*, 595 F.2d 185, 190 (3d Cir.1979); *Santana v. United States*, 572 F.2d 331, 335 (1st Cir.1977); *Cunningham v. Subaru of America, Inc.*, 684 F.Supp. 1567, 1569–70 (D.Kan.1988). The jury's finding that the deceptive trade practices of Continental Airlines were not the producing cause of plaintiff Karen Johnson's injuries is not contrary to the great weight of the evidence.

## VI. AMENDED JUDGMENT

Plaintiffs have also raised three objections to the form of judgment entered on the Johnson and Cooke claims: (1) judgment improperly reflects language beyond the special interrogatory on gross negligence, (2) judgement reflects miscalculation of the reduction to which defendants are entitled under Idaho law, and (3) judgment should reflect the appropriate rate of pre-judgment interest provided by Idaho law. Because further briefing is necessary on the choice of law principles regarding pre-judgment interest, we will reserve ruling on these issues at this time. For purposes of these issues only, plaintiffs' motion to modify judgment will be held in abeyance pending simultaneous supplementary briefing on the issue of pre-judgment interest.

## ORDER

IT IS HEREBY ORDERED that Motion of the Plaintiffs Steering Committee to Modify Judgment or for New Trial is DENIED in all respects except: (1) motion to strike reference to "actual conscious indifference" from judgment, (2) motion to set aside setoff amounts tendered by defendants, and (3) motion to specify rate of pre-judgment interest in judgment, which remain pending; it is further

ORDERED that Motion of Plaintiffs Smith, Stewart and Spicer for Amendment, Alteration or Clarification of Judgment, or, in the alternative for New Trial in the Exemplar Case is DENIED; it is further

ORDERED that the parties are directed to file simultaneous briefs on the law of pre-judgment interest to be applied in *Karen Svea Johnson and Robert Cooke, Jr. v. Continental Airlines, Inc.*, 88–F–664 (Id. Case No. 88–1075) and in all cases consolidated in the District of Colorado, *In re Air Crash Disaster at Stapleton International Airport, Denver, Colorado, on November 15, 1987*, MDL 751 on or before March 17, 1989; it is further

ORDERED that the briefing schedule set in Order MDL 751–32 is hereby VACATED, the Proposed Final Pretrial Order, simultaneous statements of positions on disputed areas of the order, and simultaneous briefs in support of those positions shall be filed on or before March 21, 1989.

## APPENDIX A

### SPECIAL VERDICT FORMS

Sherman G. Finesilver, Chief Judge

January 27, 1989

Returned January 31, 1989

In the United States District Court
for the District of Colorado

Civil Action No. MDL 751

In re: AIR CRASH DISASTER AT STA-
PLETON INTERNATIONAL AIRPORT,
DENVER, COLORADO, ON NOVEMBER
15, 1987

## SPECIAL VERDICT FORM A

We, the jury, answer the questions sub-
mitted to us in the special verdict as to
each plaintiff, as follows:

Karen Svea Johnson

QUESTION NO. 1: What are the total
damages sustained by the plaintiff, Karen
Svea Johnson, as a result of this accident?

ANSWER: $ 779,000.00

QUESTION NO. 2: What portion of the
total amount of damages found by you in
answer to Question No. 1 do you allocate to
"non-economic damages"?

ANSWER: $ 575,000.00

QUESTION NO. 3: What portion of the
total amount of damages found by you in
answer to Question No. 1 do you allocate to
"economic damages"?

ANSWER: $ 204,000.00

Robert Cooke, Jr.

QUESTION NO. 4: What are the total
damages sustained by the plaintiff, Robert
Cooke, Jr., for loss of consortium as a
result of this accident?

ANSWER: $ 21,700.00

QUESTION NO. 5: What portion of the
total amount of damages found by you in
answer to Question No. 4 do you allocate to
"non-economic damages"?

ANSWER: $ 8,500.00

QUESTION NO. 6: What portion of the
total amount of damages found by you in
answer to Question No. 4 do you allocate to
"economic damages"?

ANSWER: $ 13,200.00

QUESTION NO. 7: Do you find that the
defendant engaged in willful or reckless
misconduct as defined in Jury Instruction
No. 29 _____? (Yes or No)

ANSWER ___YES___

Dated this 31 day of January 1989 at
Denver, Colorado.

| ___X___ | ___X___ |
| | Foreperson |
| ___X___ | ___X___ |
| ___X___ | ___X___ |

## APPENDIX B

## INSTRUCTIONS OF THE COURT

Sherman G. Finesilver, Chief Judge

January 27, 1989

### JURY INSTRUCTION NO. _1_

You have heard all the evidence and the
arguments of counsel. Now I will instruct
you on the law that will govern you in your
deliberation. You, as jurors, are the sole
judges of the facts, but you must follow
the law contained in these instructions and
apply that law to the facts which you may
find from the evidence.

No one of these instructions states all of
the applicable law, but all of them must be
considered together because they are con-
nected with and related to each other as a
whole.

You are not to be concerned with the
wisdom of any rule of law. Regardless of
any opinion you may have as to what the
law is or what the law should be, you must
follow the law contained in these instruc-
tions. It would be a violation of your
sworn duty to apply any view of the law
other than that contained in these instruc-
tions, just as it would be a violation of that
same duty to base a verdict on any facts
other than those proven by the evidence.

You must perform your duty as jurors
without bias or prejudice as to any party.
The law does not permit you to be gov-
erned by sympathy, prejudice, or public
opinion. Both parties expect that you will
carefully and impartially consider all of the
evidence, follow the law as it is now being
given to you, and reach a just verdict—re-
gardless of the consequences.

I did not, and do not by these instruc-
tions, in any way express any opinion as to
what has or has not been proven in the
case, or as to what are or are not the facts
of the case.

### JURY INSTRUCTION NO. _15_

Defendant Continental Airlines, Inc. is a
common carrier. As such, it must exercise
the highest possible degree of skill, care,
caution, diligence, and foresight consistent
with the practical operation of its airline

for the protection of its passengers from injury or death. The slightest deviation from the highest degree of care constitutes negligence toward the passengers.

JURY INSTRUCTION NO. 29

You must also determine whether plaintiffs' injuries arise out of willful or reckless misconduct on the part of defendant Continental Airlines, Inc.

Reckless misconduct is action taken without heed or concern for consequences or with wanton disregard or conscious indifference to the consequences.

Willful misconduct is present if the defendant intentionally does or fails to do an act, knowing or having a reason to know facts which would lead a reasonable man to realize that this conduct not only creates unreasonable risk of harm to another, but involves a high degree of probability that such harm would result.

JURY INSTRUCTION NO. 30

You shall consider whether punitive damages should be assessed against the defendant, Continental Airlines, Inc. You must determine if the conduct complained of was attended by circumstances of gross negligence.

Punitive damages, if assessed, are to be assessed as punishment of the defendant, and as an example to others.

JURY INSTRUCTION NO. 31

Gross negligence means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omisson complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it.

"Conscious indifference" denotes a decision, in the face of an impending harm to another party, to not care about the consequences of the act which may ultimately lead to that harm. There must be evidence which makes it fair to conclude that the defendant had decided to ignore the rights of the injured party, even in light of probable and threatened injury.

The existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions. All circumstances and elements may be considered in determining whether an act, or a series of acts considered collectively, constitutes gross negligence.

A showing of slight care by defendants is not sufficient to defeat a claim of gross negligence. Instead, you must determine whether in light of all the surrounding circumstances, the defendants failed to exercise care, or exercised so slight a degree of care, that one can say the defendants were consciously indifferent to the interest of others.

JURY INSTRUCTION NO. 32

Malice means either of the following: (1) conduct that is specifically intended to cause substantial injury to plaintiffs; or (2) an act carried out with a flagrant disregard for the rights of others and with the defendants' actual awareness that the act will, in reasonable probability, result in great bodily harm or property damage.

JURY INSTRUCTION NO. 33

Defendant's subjective state of mind need not be proven by direct evidence.

A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is evidence of gross negligence.

JURY INSTRUCTION NO. 42

These instructions contain the law that will govern you in this case.

No one of these instructions states all of the law applicable, but all of them must be taken, read, and considered together because they are connected with and related to each other as a whole.

You must not be concerned with the wisdom of any rule of law. Regardless of any opinion you may have as to what the law should be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in the instructions of the Court.

The Court did not in any way and does not by these instructions express any opinions as to what has or has not been proved in the case, or to what are or are not the facts of the case.

## APPENDIX C

### PASSENGER SEATING SCHEMATIC

Sherman G. Finesilver, Chief Judge

January 27, 1989

In the United States District Court

for the District of Colorado

Civil Action No. MDL 751

In re: AIR CRASH DISASTER AT STAPLETON INTERNATIONAL AIRPORT, DENVER, COLORADO, ON NOVEMBER 15, 1987

---

### SPECIAL VERDICT FORM C

---

QUESTION NO. 1: Do you find that the defendant was grossly negligent with respect to the plaintiffs and should be assessed punitive damages? (Yes or No)
ANSWER:      NO

QUESTION NO. 2: Do you find the defendant acted with malice? (Yes or No)
ANSWER:      NO

Dated this 31 day of January 1989 at Denver, Colorado.

| X | X |
|---|---|
| | Foreperson |
| X | X |
| X | X |

LEGEND

| | |
|---|---|
| Bruecher, Lee | Rt. Pilot Seat |
| Case, Richard | 23F |
| Engelhart, Kelly | Left Rear C/A |
| Helpenstell, Fred | 15F |
| Hepp, Steve | 23E |
| Johnson, Karen | 6C |
| McElheney, Diane | 11F |
| Wadsworth, Greg | 23C |
| Zvonek, Frank | Left Pilot Seat |
| Daniel, Dave | 12D |
| Smoot, Libby | 24A |
| Weltz, Shirley | 21F |